UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

HENRIETTA TITILOLA DANIEL,

                      **Plaintiff,**

        -against-

**THE DISTRICT DIRECTOR, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,**

                      **Defendant.**

-----------------------------------------------------------X

14-CV-02060 (PAC)(SN)

REPORT AND RECOMMENDATION

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE PAUL A. CROTTY:**

    *Pro se* plaintiff Henrietta Titilola Daniel, a native of Nigeria, brings this action against the defendant United States Citizenship and Immigration Services ("CIS").[1] Daniel seeks review of CIS's final decision, dated April 22, 2014, denying her application to become a naturalized U.S. citizen and also alleges that CIS did not decide her naturalization application in a reasonable timeframe. CIS has moved for summary judgment.

    Because I find that (1) Daniel was not lawfully admitted for permanent residence, and thus was ineligible for naturalization, and (2) Daniel has not demonstrated that the delay in adjudicating her application was unreasonable, I recommend that CIS's motion be GRANTED.

---

[1] "As part of the Homeland Security Act of 2002, the [United States Immigration and Naturalization Service] was divided into two different bureaus: the Bureau of Immigration and Customs Enforcement and the Bureau of U.S. Citizenship and Immigration Services. The Bureau of U.S. Citizenship and Immigration Services (CIS) handles applications for U.S. citizenship." Chan v. Gantner, 464 F.3d 289, 290 (2d Cir. 2006) (citing Brown v. Ashcroft, 360 F.3d 346, 348 n.1 (2d Cir. 2004)).

# BACKGROUND

## I. Procedural Background

On March, 13, 2014, Daniel filed a complaint alleging that CIS had not timely decided her naturalization application, which was still pending. After CIS issued its decision denying her naturalization application on April 22, 2014, Daniel wrote to the Court on May 11, 2014, requesting that the Court also review the agency's denial. In its May 13, 2014 Order, the Court deemed the letter to supplement Daniel's complaint.

On July 23, 2014, CIS filed a motion for summary judgment along with a supporting memorandum of law, Rule 56.1 statement, Notice to Pro Se Litigant Pursuant to Local Civil Rule 56.2, and declaration of Maria I. Guerra.[2] On August 5, 2014, CIS filed an answer to the complaint. On September 9, 2014, Daniel filed an opposition to CIS's motion for summary judgment. On October 2, 2014, Daniel filed a letter with the Court arguing an additional point in support of her position. On October 17, 2014, CIS filed a reply memorandum of law in support of its motion for summary judgment. On October 27, 2014, Daniel filed a final closing letter and brief in support of her position. The matter is considered fully briefed.

## II. Factual Background

The following are the undisputed facts taken from CIS's Rule 56.1 statement and gleaned from Daniel's submissions.[3]

---

[2] Pursuant to Local Civil Rule 56.2, a party moving for summary judgment against a *pro se* party shall serve and file, together with the papers in support of the motion, a notice setting out the requirements of Federal Rules of Civil Procedure Rule 56 and Local Civil Rule 56.1. Local Civ. R. 56.2.

[3] Daniel did not file a Local Civil Rule 56.1 statement but did file "Objections to the Defendant's Motion for Summary Judgment." ECF No. 24 at 4-9. Because she is *pro se*, the Court has excused any failure to comply with Rule 56.1 and treats her opposition papers as though they contain a counterstatement under the Rule. See Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001). Further, the Court has reviewed the record to marshal facts in support of Daniel's position rather than accepting as true all of the undisputed facts in CIS's submission, which the Court would otherwise do under Rule 56.1. See id. See also Mateo v. Bristow, 12 Civ. 5052 (RJS)(GWG), 2014 WL 4631569, at *1 (S.D.N.Y. Sept. 17, 2014).

Daniel was born on July 8, 1986 in Lagos, Nigeria. On September 20, 2005, Daniel's father Henry O. Daniel, a naturalized U.S. citizen, filed a visa petition (Form I-130) on behalf of Daniel (and her mother, Ronke Susanah Daniel, and brother, Henry Mobolaji Daniel). At the time, Daniel was nineteen years old, unmarried, and living in Nigeria. The visa petition classified Daniel as an "immediate relative," predicated on Daniel's status as the unmarried child of a U.S. citizen. CIS approved the I-130 visa petition on February 8, 2006.[4]

On February 6, 2006, Daniel applied at the U.S. Consulate General in Lagos, Nigeria, for a non-immigrant K-4 visa[5] that would allow her to travel to the United States to complete the process of applying to become a lawful permanent resident ("LPR").[6] On March 28, 2006, she was granted the non-immigrant K-4 visa, predicated on her status as an unmarried child of a U.S. citizen. On April 1, 2006, Daniel arrived in the United States and was admitted on the K-4 visa.

---

[4] Under the Immigration and Nationality Act ("INA"), the term "child" means "an unmarried person under twenty-one years of age." 8 U.S.C. § 1101(b). See also CIS POLICY MANUAL, Vol. 12, Pt. H, Ch. 2, available at http://www.uscis.gov/policymanual/HTML/PolicyManual-Volume12-PartH-Chapter2.html (explaining that INA § 101(b) governs the definition of a child for the purposes of visa applications whereas INA §101(a) governs the definition of a child for the purposes of citizenship and naturalization).

[5] Immigration law allows certain individuals to be admitted, on K visas, to the United States as non-immigrants while they await the adjudication of a Form I-130 petition. See K-3/K-4 Nonimmigrant Visas, available at http://www.uscis.gov/family/family-us-citizens/k3-k4-visa/k-3k-4-nonimmigrant-visas (last visited Dec. 30, 2014). Once admitted to the U.S., the K non-immigrants may apply to adjust to lawful permanent resident status. Id. Section 101(a)(15)(K) of the Immigration and Nationality Act lists three non-immigrant visa categories, including (1) a fiancé seeking to enter the United States to conclude a valid marriage (K-1 visas), (2) a spouse married to a U.S. citizen who seeks to enter the U.S. while the family-based immigrant visa petition that the U.S. citizen filed is pending adjudication (K-3 visas), and (3) the minor children accompanying or following the fiancés (K-2 visas) and the spouses (K-4 visas). See Matter of Jean Ro Saclolo Valenzuela, 25 I. & N. Dec. 867, 867 n.1 (B.I.A. 2012) (citing 8 U.S.C. § 1101(a)(15)(K)).

[6] As of February 8, 2006, Daniel was eligible to apply for an immigrant visa, because her I-130 visa petition had been approved, and also was eligible to apply for a non-immigrant K-4 visa. Daniel argues that she should have been granted an immigrant visa because one was available to her. But she did not apply for such a visa and thus only obtained the non-immigrant K visa for which she applied. In any event, had Daniel been granted an immigrant visa instead, she would have found herself in the same predicament when she married before her adjustment of status was granted. The CIS website that Daniel cites in support of her argument does not contradict this. See ECF No. 28 (citing http://www.uscis.gov/family/family-us-citizens/k3-k4-visa/k-3k-4-nonimmigrant-visas).

On August 18, 2006, Daniel, through counsel, filed an application for adjustment of status (Form I-485) to that of a LPR, again predicated on her immediate relative status as an unmarried child of a U.S. citizen. In February 2007, the CIS National Benefits Center completed its initial processing and transferred her application to the CIS Atlanta Field Office, which received it on February 23, 2007.[7] On March 20, 2007, CIS interviewed Daniel in connection with her application for adjustment of status. CIS sought additional information from Daniel regarding her vaccination history, which it received on April 9, 2007.

On June 20, 2007, Daniel's counsel submitted an inquiry to CIS seeking a status update on the applications for Daniel and her family members. On June 22, 2007, CIS responded that the Atlanta Field Office was still processing applications for adjustment of status received in September 2006, and applications are processed in the order in which they are received.

On November 13, 2007, while the application was pending, Daniel married Oluwaseun Popoola. She nor counsel informed CIS of this change, which by application of law converted Daniel's immigration status from the immediate relative category (as an unmarried child of a U.S. citizen) to the third family preference ("F3 preference") category (as a married daughter (21 or older) of a U.S. citizen). On April 2, 2008, unaware that Daniel had married, CIS approved Daniel's application for adjustment of status to LPR status based on the "IR7" category, which is used for the unmarried children of U.S. citizens inside the United States.

Over four years later, on January 8, 2013, Daniel filed an application for naturalization (Form N-400) with CIS. She accurately reported in that form that she had married on November

---

[7] Daniel's adjustment of status application was initially handled by CIS's National Benefits Center in Lee's Summit, Missouri, which performs initial processing of applications. On February 23, 2007, CIS transferred the application to CIS's Atlanta Field Office because it was the relevant office for Daniel's residence at that time.

13, 2007. On July 29, 2013, a CIS officer interviewed Daniel as part of the naturalization application process. After the interview, the adjudicating officer requested a copy of Daniel's marriage certificate. On July 30, 2013, Daniel provided the copy.

The adjudicating officer thereafter determined that Daniel's LPR status was unlawful: because she was married when she received her LPR status, she had not been eligible to adjust as the unmarried child of a U.S. citizen. Because naturalization requires LPR status, the officer determined she was not eligible to naturalize. Pursuant to CIS's Policy Memorandum relating to deportable individuals, the officer determined that Daniel was deportable. But on November 27, 2013, he recommended to the Notice to Appear ("NTA") panel that CIS not initiate removal proceedings against her.[8] See 8 U.S.C. § 1227(a)(1)(A) (declaring removable those individuals who were inadmissible at the time of their adjustment to LPR status). On March 24, 2014, the NTA panel adopted the officer's recommendation. On April 22, 2014, the CIS officer denied Daniel's application.

---

[8] CIS's decision not to pursue removal proceedings is an exercise of "prosecutorial discretion." See Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471, 489-90 (1999). CIS retains prosecutorial discretion to decline to institute removal proceedings, terminate proceedings, or decline to execute a final order of deportation. See Akinsade v. Holder, 678 F.3d 138, 146-47 (2d Cir. 2012); Gupta v. U.S. Att'y Gen., 12 Civ. 5637 (FM), 2014 WL 1116730, at *14 (S.D.N.Y. March 20, 2014). Under the guidelines set by the "Morton Memoranda," CIS prioritizes removing those individuals who have committed violent crimes while considering granting relief to individuals whose cases meet certain non-priority criteria. Akinsade, 678 F.3d at 146-47; Memorandum from John Morton, Director, U.S. Immigration and Customs Enforcement, to All ICE Employees (Mar. 2, 2011) ("Subject: Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens"); Memorandum from John Morton, Director, U.S. Immigration and Customs Enforcement, to All Field Office Directors, All Special Agents in Charge, All Chief Counsel (June 17, 2011) ("Subject: Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens"). CIS enforcement decisions on whether to commence or execute removal proceedings are not judicially reviewable. Reno, 525 U.S. at 481-83.

**DISCUSSION**

**I.      *De Novo* Standard of Review**

When CIS denies a naturalization application, the applicant may seek judicial review in the United States district court for the district in which she resides. 8 U.S.C. § 1421(c). See also 8 C.F.R. §§ 310.5(b), 336.9. A district court's review must be made in accordance with the Administrative Procedure Act ("APA"). 8 U.S.C. § 1421(c). The review "shall be *de novo*, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing *de novo* on the application." 8 U.S.C. § 1421(c); Chan, 464 F.3d at 290-91.

**II.     Summary Judgment Standard**

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). See also Local Civ. R. 56.1. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., LP, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). See also Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc., 182 F.3d 157, 160 (2d Cir. 1999)

("[Because] summary judgment is a drastic device [that] cuts off a party's right to present his case to the jury. . . . the moving party bears a heavy burden of demonstrating the absence of any material issues of fact.") (internal quotation marks and citations omitted). Once demonstrated, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. "Even where facts are disputed, in order to defeat summary judgment, the nonmoving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor." Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 101 (2d Cir. 2001).

In determining whether summary judgment is appropriate, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010) (citing LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005)). In a *pro se* case, the Court must liberally construe the party's pleadings "to raise the strongest arguments that they suggest." Marte v. United States, 952 F. Supp. 2d 537, 540 (S.D.N.Y. 2013) (citing McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (citation omitted)).

### III. Applicable Law

#### A. Family Visas and Applications for Adjustment of Status to LPR Status

An individual "needs an immigrant visa to enter and permanently reside in the United States."[9] Scialabba v. Cuellar de Osorio, 134 S. Ct. 2191, 2197 (June 9, 2014) (citing 8 U.S.C.

---

[9] An individual already in the U.S. on a non-immigrant visa (for example, a K-4 visa) applies for "adjustment of status," rather than an immigrant visa, to become an LPR. See Scialabba, 124 S. Ct. at 2197 n.1 (citing 8 U.S.C. §1255(a)). The criteria for securing adjustment of status and obtaining an immigrant visa are materially the same. Id.

7

§ 1181(a)). To obtain a visa, an individual must fall within one of a limited number of immigration categories. Scialabba, 134 S. Ct. at 2197-98; 8 U.S.C. §§ 1151(a)-(b). The most favored category is the "immediate relative" category, which includes parents, spouses, and unmarried children (under age 21) of U.S. citizens. Scialabba, 134 S. Ct. at 2197 (citing 8 U.S.C. § 1151(b)(2)(A)(i)). Following the immediate relative category, the INA sets out five "family preference" categories, which include more distant and independent relatives of U.S. citizens and LPRs: (1) F1 – the unmarried, adult (21 or over) sons and daughter of U.S. citizens; (2) F2A – the spouses and unmarried, minor (under 21) children of LPRs; (3) F2B – the unmarried adult (21 or over) sons and daughters of LPRs; (4) F3 – the married sons and daughters of U.S. citizens; and (5) F4 – the brothers and sisters of U.S. citizens. Scialabba, 124 S. Ct. at 2197 (citing 8 U.S.C. §§ 1151(a)(1), 1153(a)(1)-(4)).

An individual who seeks adjustment of status based on a familial relationship must have a relevant, sponsoring U.S. citizen or LPR family member file an I-130 visa petition on her behalf. Scialabba, 124 S. Ct. at 2197; Drax v. Reno, 338 F.3d 98, 114 (2d Cir. 2003) (citing 8 U.S.C. §§ 1153(a)(1), 1154(a)(1)(A)(i)). After the relative has filed the sponsoring I-130 petition, the INS will verify that the claimed familial relationship is *bona fide* and "approve" the petition. Drax, 338 F.3d at 114. Once the INS has approved an individual's I-130 petition, the applicant must still wait until a visa is "immediately available" in order to file her I-485 application to adjust her status. Id. at 114-15 (citing 8 U.S.C. § 1255(a); 8 C.F.R. §§ 245.1(g)(1), 245.2(a)(2)(i)(A)).

For immediate relatives, visas are not subject to numerical limitations, and the visa is immediately available as soon as the I-130 petition is approved – which is why this is the favored category for applicants. See Li v. Renaud, 654 F.3d 376, 377-78 (2d Cir. 2011). For individuals

in the family preference categories, however, the approval of the I-130 petition merely gets them a place in line. Scialabba, 134 S. Ct. at 2198; Li, 654 F.3d at 378 (citing Bolvito v. Mukasey, 527 F.3d 428, 431 n.4 (5th Cir. 2008)). "Within preference categories, immigrant visas are issued to beneficiaries on a first-come-first-served basis, in order of the date the petition was filed," which is referred to as the petitioner's "priority date."[10] Li, 654 F.3d at 378. "Whether a visa is 'immediately available' depends on the alien's priority date *and* the length of the waiting period for a visa in the alien's 'preference category,' as indicated in the Department of State Bureau of Consular Affairs Visa Bulletin at the time the I-485 application is filed." Drax, 338 F.3d at 115 (emphasis in original) (citing 8 C.F.R. § 245.1(g)(1); Matter of Rainford, 20 I. & N. Dec. 598, 599 (B.I.A. 1992)).

The waiting line to receive a family preference visa "takes time – and often a lot of it." Scialabba, 34 S. Ct. at 2199. "After a sponsoring petition is approved but before a visa application can be filed, a family-sponsored immigrant may stand in line for years – or even decades – just waiting for an immigrant visa to become available." Id. (citing Dep't of State, Bureau of Consular Affairs, 9 Visa Bulletin, Immigrant Numbers for December 2013 (Nov. 8, 2013)). See, e.g., Li, 654 F.3d at 378 ("The number of family preference petitions each year for visas for Chinese immigrants, for example, far exceeds the numerical limitations for each family

---

[10] The priority date is relevant because "[a]n immigrant visa is considered available for [the purpose of] accepting and processing the application Form I-485 i[f] the preference category applicant has a priority date on the waiting list which is earlier than the date shown in the Bulletin (or the Bulletin shows that numbers for visa applicants in his or her category are current)." Drax, 338 F.3d at 115 (emphasis in original) (citing 8 C.F.R. § 245.1(g)(1)). "Every month, the Department of State sets a cut-off date for each family preference category, indicating that visas (sometimes referred to by "visa numbers") are available for beneficiaries with priority dates earlier than the cut-off." Scialabba, 134 S. Ct. at 2198 (citing 8 C.F.R. 245.1(g)(1); 22 C.F.R. § 42.51(b)).

preference category. It is not uncommon for such immigrants to wait a decade or more after USCIS granted the petition to receive a visa.")

Only when a visa becomes available can the applicant then file an I-485 application for adjustment of status. 8 U.S.C. § 1255(a). The application requires the applicant to demonstrate her admissibility to the United States in various ways. See Scialabba, 134 S. Ct. at 2198 (noting an applicant must demonstrate she has no serious health problems, was not convicted of certain crimes or engaged in terrorist activities, etc.). The applicant "must establish that he or she is eligible for the requested benefit at the time of filing the benefit request and *must continue to be eligible through adjudication*." Gulotti v. Holder, 486 F. App'x 219, 221-22 (2d Cir. 2012) (citing 8 C.F.R. § 103.2(b)(1)) (emphasis added). The approval of a family visa petition will be "revoked as of the date of approval . . . if the beneficiary . . . is an applicant for adjustment of status to that of a permanent resident" based on immediate relative status, and "before the decision on his or her adjustment application becomes final," the applicant marries. 8 C.F.R. § 205.1(a).

Where there are changes in circumstances such as marriage, however, an applicant's petition is not completely nullified. 8 C.F.R. § 204.2(i). See generally Scialabba, 134 S. Ct. at 2204; Li, 654 F.3d at 384. By application of law, the marriage merely converts the applicant from one category to another:

> A currently valid petition previously approved to classify a child of a United States citizen as an immediate relative . . . shall be regarded as having been approved for [F3] preference status [for the married children of U.S. citizens] . . . as of the date the beneficiary marries. The beneficiary's priority date is the same as the date the petition for [immediate relative] classification was properly filed.

8 C.F.R. § 204.2(i)(1)(ii). Thus, when an applicant previously approved for a visa marries, her application is automatically converted to the F3 preference category with the result that instead of immediately being able to adjust to LPR status, the applicant has to wait in line.

### B.	Lawfully Admitted for Permanent Residence and Naturalization

To qualify for naturalization, an applicant first must be lawfully admitted for permanent residence to the United States. See 8 U.S.C. § 1427(a) ("No person . . . shall be naturalized unless such applicant, (1) immediately preceding the date of filing his application for naturalization has resided continuously, *after being lawfully admitted for permanent residence*, within the United States for at least five years . . . .") (emphasis added); 8 U.S.C. § 1429 ("[N]o person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions in this chapter."). See also De La Rosa v. U.S. Dep't of Homeland Sec., 489 F.3d 551, 554-555 (2d Cir. 2007); Shtykova v. Holder, 10 Civ. 4999 (SJF), 2012 WL 1004906, at *3-4 (E.D.N.Y. March 22, 2012). "The term 'lawfully admitted for permanent residence' means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws." 8 U.S.C. § 1101(a)(20); Caraballo-Tavera v. Holder, 683 F.3d 49, 51 (2d Cir. 2012).

The Board of Immigration Appeals ("BIA") has held that the term "lawfully" "denotes compliance with substantive legal requirements, not mere procedural regularity." In re Koloamatangi, 23 I. & N. Dec. 548, 550 (B.I.A. 2003); De La Rosa, 489 F.3d at 554-55 (upholding the BIA's interpretation as reasonable) (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 104 (1984)). Thus, in In re Koloamatangi, an individual who was originally ineligible for LPR status because she "obtained [her] permanent resident status by

11

fraud, or *had otherwise not been entitled to it*" was "deemed, *ab initio*, never to have obtained lawful permanent resident status." 23 I. & N. Dec. at 550-51 (emphasis added). See also De La Rosa, 489 F.3d at 553; Flerinord v. Mukasey, 05 Civ. 8920 (NRB), 2008 WL 2465035, at *3 (S.D.N.Y. June 18, 2008).

Although the facts of In re Koloamatangi involved fraud, the Court of Appeals for the Second Circuit and many of its sister circuits have affirmed the BIA's interpretation that an individual can be deemed to have unlawfully adjusted to LPR status due to non-fraudulent reasons. See Villafana v. Holder, 358 F. App'x 245, 246 (2d Cir. Dec. 21, 2009) ("even for those who obtained their LPR status by mistake rather than fraud, if petitioner fails to demonstrate that he or she had complied with the relevant substantive legal requirements at the time petitioner was admitted for permanent residence, then petitioner was never 'lawfully admitted for permanent residence'") (citing De La Rosa, 489 F.3d at 555); Injeti v. U.S. Citizenship & Immigration Servs., 737 F.3d 311 (4th Cir. 2013) (affirming a BIA decision that concluded the petitioner had not been lawfully admitted when her application included misrepresentations about previous husbands, regardless of whether the misrepresentation was not fraudulent or willful, or was made by her attorney); Walker v. Holder, 589 F.3d 12, 19 (1st Cir. 2009) (affirming a BIA order that concluded the petitioner had not been lawfully admitted when he acquired his LPR status "through the fraud or misrepresentation of third parties").[11] See also Shtykova, 2012 WL 1004906, at *3-4 (denying naturalization to an individual who successfully but unlawfully adjusted her status to LPR due to an error by CIS); Flerinord, 2008 WL 2465035,

---

[11] Other circuit courts have agreed with "the fundamental reasoning of the fraud line of cases . . . and the application of that reasoning to . . . 'non-fraud cases.'" Gallimore v. U.S. Att'y Gen., 619 F.3d 216, 224 (3d Cir. 2010). See also Shin v. Holder, 607 F.3d 1213, 1217 (9th Cir. 2010); Estrada-Ramos v. Holder, 611 F.3d 318, 321 (7th Cir. 2010); Savoury v. U.S. Att'y Gen., 449 F.3d 1307, 1313 (11th Cir. 2006).

at *4 (denying naturalization to an individual who successfully but unlawfully adjusted his status to LPR as he was married but had predicated his visa on being the unmarried son of a U.S. citizen). This principle applies even when the mistake was entirely made by CIS. See, e.g., Arellano-Garcia v. Gonzales, 429 F.3d 1183, 1186 (8th Cir. 2005) (affirming a BIA order that concluded the petitioner had not been lawfully admitted because his LPR status "was obtained by a negligent mistake made by the government").

## IV. Analysis

### A. Lawful Permanent Resident Status and Naturalization

Daniel is statutorily ineligible for naturalization because she was not *lawfully* admitted for permanent residence: she was not eligible for LPR status at the time she adjusted to it. Consequently, her LPR status is void *ab initio* because it did not comply with the relevant substantive legal requirements on which it was predicated. Because *lawful* LPR status is a naturalization prerequisite, she is ineligible to naturalize. See De La Rosa, 489 F.3d at 554.

An applicant must maintain eligibility for a benefit at the time of filing, through adjudication, and until her decision on the adjustment application becomes final. See Gulotti, 486 F. App'x at 221-22 (citing 8 C.F.R. § 103.2(b)(1); 8 C.F.R. § 205.1(a)). It does not matter, as Daniel alleges, that she had already been interviewed by the time she was married. Her application had not yet been *approved* when she married, and thus it was still pending. As a result, she did not maintain eligibility to adjust to LPR status as an immediate relative through the time that her application was finalized. See De La Rosa, 489 F.3d at 554-55 (holding that an individual's LPR status is only lawful if it complied with the substantive legal requirements).

When CIS mistakenly granted Daniel LPR status, not only was she ineligible for it as an immediate relative, but she was also ineligible for it under the F3 category, because her F3

13

priority date was not yet current. When Daniel's married, her petition automatically converted from the immediate relative category to the F3 preference category. Under the F3 preference category, September 20, 2005 (the date upon which Daniel's father filed the I-130 visa petition) became her priority date – her marker in the line for an available visa to adjust to LPR status. In April 2008, when Daniel's LPR adjustment as an immediate relative was mistakenly approved by CIS, her priority date in the F3 category was not current. As of that date, according to the State Department's Bureau of Consular Affairs April 2008 *Visa Bulletin*, only F3 applicants who had applied before May 22, 2000 were eligible for a visa and adjustment of status. Declaration of Maria I. Guerra ¶ 12. Moreover, a September 20, 2005 priority date is still not current: according to the State Department's Bureau of Consular Affairs December 2014 *Visa Bulletin*, F3 visas are available only for applicants with a priority date of December 15, 2003 or earlier. See Dep't of State, Bureau of Consular Affairs, Visa Bulletin, Immigrant Numbers for December 2014, available at http://travel.state.gov/content/visas/english/law-and-policy/bulletin/2015/visa-bulletin-for-december-2014.html (last visited Dec. 17, 2014). That is, F3 visa applicants like Daniel whose priority dates are September 20, 2005 or later are *still* waiting in line for an available visa.

      Further, CIS was not required to warn Daniel of the consequences of a change in eligibility status. See Bae v. INS, 706 F.2d 866, 870-71 (8th Cir. 1983) ("[CIS] officials have no duty to warn applicants for adjustment of status that marriage will alter their preference classification for immigration visas."). Instead, it was the responsibility of Daniel and her counsel to inform CIS of her change in marital status.[12] Although CIS's ignorance of Daniel's

---

[12] The CIS website states,
> Things to keep in mind: . . . If an immediate relative child under age 21 gets married, he or she can no longer be classified as an "immediate relative" and will become a "third

marriage may not have been willful on Daniel's part, the law is clear that an individual is ineligible for naturalization where she successfully but unlawfully adjusted to LPR status. See Shtykova, 2012 WL 1005906, at *3-4. See also Gallimore, 619 F.3d at 223-24 ("[W]e discern no principled distinction between (1) finding a status adjustment not 'lawful' because the applicant procured it through fraud; and (2) finding a status adjustment not 'lawful' because the applicant was not legally entitled to it for any other reason.").

The Court also lacks authority to equitably remedy Daniel's ineligibility for naturalization. See Hizam v. Kerry, 747 F.3d 102, 110 (2d Cir. 2014) ("Courts cannot grant citizenship through their equitable powers.") (citing I.N.S. v. Pangilinan, 486 U.S. 875, 885 (1988)); Fedorenko v. United States, 449 U.S. 490, 517 (1981) ("Once it has been determined that a person does not qualify for citizenship, . . . the district court has no discretion to ignore the defect and grant citizenship.") (citation omitted). CIS's ignorance of a material fact also does not allow the Court to equitably estop CIS from ruling that Daniel's LPR status is unlawful. See Rojas-Reyes v. I.N.S., 235 F.3d 115, 126 (2d Cir. 2000) (holding that "estoppel will only be applied upon a showing of 'affirmative misconduct' by the government); Drozd v. I.N.S., 155 F.3d 81, 90 (2d Cir. 1998) ("The doctrine of equitable estoppel is not available against the government except in the most serious of circumstances . . . and is applied with the utmost caution and restraint.") (internal quotations and citations omitted); Shtykova, 2013 WL 4501013, at *4 ("The Second Circuit applies 'estoppel to the Government only in those limited cases

---

preference" (F3) category married son or daughter of a U.S. citizen and a visa would no longer be immediately available. You must notify us of any change in your marital status after Form I-130 has been filed for you and prior to becoming a permanent resident or obtaining an immigrant visa.

Dep't of State, CIS, Green Card for an Immediate Relative of a U.S. Citizen, available at http://www.CIS.gov/green-card/green-card-through-family/green-card-immediate-relative-us-citizen (last visited Dec. 17, 2014).

where the party can establish both that the Government made a misrepresentation upon which the party reasonably and detrimentally relied and that the Government engaged in affirmative misconduct.") (quoting City of New York v. Shalala, 34 F.3d 1161, 1168 (2d Cir. 1994)).

    **B.    Reasonable Time**

Daniel's argument that CIS did not timely adjudicate her adjustment of status application, in violation of 8 U.S.C. § 1447(b), is unavailing. Although there are guidelines on what constitutes a reasonable period to adjudicate a visa application, the law and regulations do not require a specific timeframe within which the agency must act on an application of this type. See, e.g., Diallo v. Reno, 61 F. Supp. 2d 1361, 1368 (N.D. Ga. 1999) ("There is no requirement that the INS issue a decision on an application for adjustment of status [by a certain] deadline.").

An agency must conclude proceedings "within a reasonable time." 5 U.S.C. § 555(b). "In determining reasonableness, [courts] look to the source of delay – e.g., the complexity of the investigation as well as the extent to which the defendant participated in delaying the proceeding." Batista v. U.S. I.N.S., 99 Civ. 2847 (MBM), 2000 WL 204535, at *4 (S.D.N.Y. Feb. 22, 2000) (alteration in original) (quoting Reddy v. Commodity Futures Trading Comm'n, 191 F.3d 109, 120 (2d Cir. 1999)). "What constitutes an unreasonable delay in the context of immigration applications depends to a great extent on the facts of the particular case." Saleh v. Ridge, 367 F. Supp. 2d 508, 512 (S.D.N.Y. 2005) (citing Yu v. Brown, 36 F. Supp. 2d 922, 935 (D. N.M. 1999); Checknan v. McElroy, 313 F. Supp. 2d 270, 275 (S.D.N.Y. 2004)).

"Evidence of the passage of time cannot, standing alone, support" a claim of unreasonable delay. Espin v. Gantner, 381 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (citing I.N.S. v. Miranda, 459 U.S. 14, 19 (1982)). See also Nigmadzhanov v. Mueller, 550 F. Supp. 2d 540, 548 (S.D.N.Y. 2008) (holding that although the petitioner had stated a claim for relief because CIS

has "a nondiscretionary duty to adjudicate her application for adjustment within a reasonable amount of time," a five to six-and-a-half year delay is not "reasonable (or unreasonable) as a matter of law at this stage of the litigation").

CIS approved Daniel's I-485 application 18 months after she filed it. During that time, Daniel's lawyer contacted CIS to inquire about the delay. CIS responded that Daniel's and her family's applications were in line waiting to be reviewed. It explained that the Atlanta Field office was experiencing a backlog, and the office was then processing applications received five months earlier than it had received Daniel's application. These facts suggest no wrongdoing or even negligence on behalf of CIS. Albeit unfortunate, such a delay is not unusual for this country's strained immigration system. Here, "[t]he only indication of negligence is the length of time that the INS took to process respondent's application. Although the time was indeed long, we cannot say in the absence of evidence to the contrary that the delay was unwarranted." Miranda, 459 U.S. at 18.

The Court and CIS also lack authority to grant Daniel adjustment of status *nunc pro tunc*.[13] The doctrine of *nunc pro tunc* "is a 'far-reaching equitable remedy' applied in 'certain exceptional cases,' typically aimed at 'rectify[ing] any injustice [to the parties] suffered by them on account of judicial [or agency] delay.'" Zhang v. Holder, 617 F.3d 650, 665 (2d Cir. 2010) (quoting Iouri v. Ashcroft, 464 F.3d 172, 182 (2d Cir. 2006)). See also Edwards v. I.N.S., 393 F.3d 299, 309-10 (2d Cir. 2004). Absent adjudicative error, affirmative government misconduct, or unreasonable delay, however, *nunc pro tunc* is not warranted. See generally Miranda, 459

---

[13] While the doctrine of prosecutorial discretion allows CIS to charge, or not charge, an individual with a ground of deportability, CIS has no prosecutorial discretion to grant an immigration benefit such as naturalization or adjustment of status. I.N.S. Exercise of Prosecutorial Discretion, Legal Op. No. 99-5 (INS), 2001 WL 1047686, at *4 (Aug. 27, 2001).

U.S. 14 (holding that even if government misconduct may in some instances estop it from enforcing immigration laws, an 18-month delay in considering an application for a spousal immigration visa was not the type of government misconduct that invoked such a remedy). See also Panchishak v. U.S. Dep't of Homeland Sec., 446 F. App'x 361, 362-63 (2d Cir. 2011) (holding that petition did not suggest a plausible basis for *nunc pro tunc* relief in action seeking adjustment of status). And no evidence demonstrates that *nunc pro tunc* relief is warranted here. Daniel herself failed to inform CIS of her change in eligibility and could have waited to marry until her visa was granted. See Anderson v. Holder, 382 F. App'x 16, 17 (2d Cir. 2010) (denying *nunc pro tunc* relief where petitioner "presented no evidence that the delay [in processing his mother's naturalization application] was untoward or that his mother took any action to expedite the application in light of his age at the time").

      Finally, according to CIS, although Daniel was never eligible to adjust to LPR status as an "immediate relative" at that time when she did, she had been eligible to adjust to LPR status via the F3 preference category. As a result, CIS purports that Daniel's current lack of immigration status is not necessarily without remedy. Daniel may be able to seek a discretionary waiver of inadmissibility and removability from an immigration judge and seek to adjust her status under the F3 preference category if and when the visa becomes available to her. Declaration of Maria I. Guerra ¶ 23 (citing 8 U.S.C. § 1227(a)(1)(H)). To facilitate any application that Daniel may want to make, the Court has attached the *Pro Se* Litigation for the Southern District of New York Office's list of immigration organization that provide free legal assistance. The Court has no affiliation with these organizations, does not endorse any of them, and cannot guarantee that any of them will be able to represent Daniel or that she will be able to successfully obtain LPR status.

## CONCLUSION

Because Daniel was not lawfully admitted for permanent residence, and thus was ineligible for naturalization, and she has not demonstrated that the delay in adjudicating her application was unreasonable, I recommend that the defendant's motion be GRANTED.

\* \* \*

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty at the Daniel Patrick Moynihan Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Crotty. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:   New York, New York
         January 5, 2015